[Nos. 26119-7-II; 26889-2-II. Division Two. July 2, 2002.]

*In the Matter of the Parentage of* J.H.

JOHN WATSON HAZEN II, *Appellant,* v. SYDNEY GAYLE
ROBINSON, *Respondent.*

*Anthony C. Otto*; and *James E. Lobsenz* (of *Carney, Badley, Smith & Spellman*), for appellant.

*Paula T. Crane*; and *Catherine Wright Smith* (of *Edwards, Sieh, Smith & Goodfriend, P.S.*), for respondent.

QUINN-BRINTNALL, A.C.J. — John Hazen appeals the trial court's designation of Sydney Calliham (formerly Robinson) as primary residential parent of their son, J.H. We hold that the trial court did not abuse its discretion by designating Calliham the primary residential parent, and we affirm. We also affirm the order requiring that Hazen purchase a life insurance policy or establish a trust to secure his child support obligation.

We reverse the order requiring Hazen to advance Calliham $12,750, to pay her appellate attorney's retainer. But we award Calliham appellate attorney fees she paid to successfully defend the residential placement and child support decisions.

We affirm in part and reverse in part.

## FACTS

J.H. was born on December 19, 1997, at Harrison Hospital in Bremerton, Washington. Calliham and Hazen signed the paternity affidavit on December 20, 1997. The parties do not dispute the child's parentage.

Calliham lives in Kitsap County, Washington. She is the mother of two other children, a son (age 17 at trial) and a daughter (age 13 at trial). She works as a teacher in the Central Kitsap School District. Calliham met Hazen when she was living next door to Hazen's parents.

Hazen lives in Glenwood Springs, Colorado, where he works as a real estate broker and developer. The trial court

found Hazen was "truly a wealthy man" and had a substantial amount of money beyond what his income taxes demonstrate. Clerk's Papers at 1340.

The affair between Calliham and Hazen began in 1996. Calliham gave birth to J.H. at the end of 1997. For the first 12 to 16 months after J.H. was born, Hazen saw Calliham and the baby sporadically at various places in the western United States when he was on business travel. After several months with no contact with J.H., Hazen obtained court-ordered visitation, including overnight visits.

At the time of this trial, Hazen had been married to another woman for 29 years. In addition to J.H., he has three daughters and seven grandchildren. Hazen paid child support from J.H.'s birth but did not tell his family about the boy or his relationship with Calliham for at least a year.

In February 1999, Hazen initiated this custody action. As part of the litigation, he made many allegations against Calliham. The two most relevant on appeal were that (1) Calliham's older son was a drug user and seller, and that Calliham had assisted her son with his drug business; and (2) that Calliham herself was a drug user.

In order to demonstrate the teenage son's alleged drug business, Hazen attempted to admit evidence of a drug deal between Calliham's elder son and Bowie Gardley. At the time of this trial, Gardley was an inmate at the Washington Corrections Center in Shelton, Washington. Hazen asked the court to order the Department of Corrections to produce Gardley or the Department's tape recording of a conversation between the inmate and Hazen's attorney. The Department of Corrections opposed both motions. The court refused to order production of the tape recordings.

Hazen also offered evidence about Calliham's drug use. This included Hazen's testimony that Calliham had smoked marijuana when they were together, and that she had used heroin and marijuana with her ex-husband. The court found that while Calliham had some contact with controlled substances, Hazen had also "dabbled once or twice in that,

but it has not been a significant part of either party's life in the last years . . . ." Clerk's Papers at 1333. The court then stated, "A great part of the Father's expenditure for fees and costs in this action has been a concerted effort to demonstrate that the Mother has continuing and ongoing problem with controlled substances which affect her ability to parent. The court could make no such finding." Clerk's Papers at 1333-34.

The trial lasted 15 days. Hazen called witnesses for 11 days and Calliham for 2 days. The guardian ad litem and the parenting evaluator also testified. At the end of the trial, the judge issued a 12-page Memorandum Decision, in addition to his Findings of Fact and Conclusions of Law. He found that Calliham "has performed her parenting functions well" (Clerk's Papers at 1336), that the child has progressed well, and that the parenting evaluator, family physician, and child's pediatrician all agreed that Calliham "is the primary, bonded parent to the Baby." Clerk's Papers at 1331. He considered the "relative strength, nature and stability of the child's relationship with each parent" under RCW 26.09.187(3) and designated Calliham the primary residential parent. Clerk's Papers at 1332. Hazen was awarded visitation with the provision that the frequency and duration of visits will increase as the child gets older.

The judge found that Hazen's interaction with the boy was "not parental but rather resembling play with a pet or a toy." Clerk's Papers at 1377. He did find that Hazen's relationship is being established and could develop into a larger role later on.

The judge also ordered both parents to pay child support, with Hazen paying the major portion of it. In addition, the judge required Hazen to take out a life insurance policy to the benefit of the child or to establish a trust guaranteeing payment of child support in case of Hazen's death.

Finally, the judge reviewed the expenses for trial. Finding that Hazen's attorney fees were over $160,000 while Calliham's were about $56,000, the court assessed Hazen 85 percent of the total attorney fees and guardian ad litem

costs, and Calliham 15 percent. In addition, the judge ordered Hazen to pay $12,750 in advance for Calliham's attorney fees to defend against his appeal.

Hazen now appeals to this court. He claims that the trial court abused its discretion by (1) awarding primary custody to the mother, (2) not ordering production of taped statements of an inmate at the Shelton correctional facility, (3) failing to recuse itself midtrial, and (4) not accepting Hazen's social security benefits in lieu of a trust fund or insurance policy for the child. He lastly claims that the trial court erred in awarding appellate attorney fees to Calliham in advance of the appeal and requests attorney fees for himself. We address each claim in turn.

## ANALYSIS

RESIDENTIAL PLACEMENT CONSIDERATIONS

■ ■ We review a trial court's rulings regarding the placement of children and the allocation of parental decision-making authority for abuse of discretion. *Fernando v. Nieswandt*, 87 Wn. App. 103, 108, 940 P.2d 1380, *review denied*, 133 Wn.2d 1014 (1997); *In re Marriage of Kovacs*, 121 Wn.2d 795, 801, 854 P.2d 629 (1993). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). On review, this court accords the trial court great deference. *In re Dependency of A.W.*, 53 Wn. App. 22, 31, 765 P.2d 307 (1988), *review denied*, 112 Wn.2d 1017 (1989). *See also In re Parentage of Jannot*, 110 Wn. App. 16, 19-22, 37 P.3d 1265 (2002) (exploring the rationale supporting an appellate court's deference to the trial court in family law matters). We will uphold a trial court's findings of fact if they are supported by substantial evidence. *Chapman v. Perera*, 41 Wn. App. 444, 449, 704 P.2d 1224, *review denied*, 104 Wn.2d 1020 (1985).

■ The trial court must make a residential placement decision in the best interests of the child and only after

considering the factors found in RCW 26.09.187(3). *Kovacs*, 121 Wn.2d at 801. The "best interests of the child" control when determining who will parent a child daily. *In re Parentage of Schroeder*, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001).

Hazen argues that the trial court abused its discretion by designating Calliham the primary residential parent. We disagree.

■■■ This is not a case where the court made its decision without considering the testimony or the law. *See In re Marriage of Cabalquinto*, 100 Wn.2d 325, 329, 669 P.2d 886 (1983) (reversal required when the reviewing court is unable to determine the basis for the court's custody ruling). Here, the judge fully considered the factors set out in RCW 26.09.187(3) in a lengthy Memorandum Decision, and applied the "best interests of the child" standard. He listened to substantial evidence from the guardian ad litem, family physician, and parenting evaluator about their independent observations and conclusions. And he listened to an additional 11 days of testimony challenging the mother's fitness. He questioned the credibility of both parties and made his determinations with those doubts in mind. The Memorandum Decision is a well-reasoned discussion of the elements of his decision, and it amply demonstrates reasonable grounds and basis for the parental selection. We hold that the court did not abuse its discretion in awarding primary residential custody to Calliham.[1]

---

[1] Hazen also argues that the trial court's finding that Calliham did not front her son money for drugs is not supported by substantial evidence. This argument is based in large part on a tape recording Hazen secretly made of Calliham. The trial court found that Hazen "in effect, sets up the Mother who did not know the conversation was being recorded to make admissions to past problems in her life . . . ." Clerk's Papers at 1333. Upon Calliham's stipulation, the trial court listened to the tape recording and concluded that she did not give her son money for a drug deal. Credibility determinations are for the trier of fact and are not subject to review. *In re Marriage of Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999). Because this court defers to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence, we find sufficient evidence to support the court's finding. *See State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992).

TAPE RECORDINGS FROM DEPARTMENT OF CORRECTIONS

Hazen argues that it was error for the trial court to refuse to issue an order to produce the tape recording of the conversation between his attorney and Gardley, an inmate at the Washington Corrections Center in Shelton, Washington. He also argues that when Gardley refused to testify, the tape should have been produced and admitted under ER 804(b)(3) (although hearsay, an unavailable declarant's reliable statements against penal interest are admissible). We disagree.

Chapter 9.73 RCW, the statutory right to privacy for communications in Washington, contains an exemption for Department of Corrections personnel. RCW 9.73.095(1) states that the statutory command does not apply to employees of the Department of Corrections when "[i]ntercepting, recording, or divulging any telephone calls from an inmate or resident of a state correctional facility . . . ." RCW 9.73.095(3)(b) states, "The contents of any intercepted and recorded conversation shall be divulged only as is necessary to safeguard the orderly operation of the correctional facility, *in response to a court order*, or in the prosecution or investigation of any crime." (Emphasis added.)

 "The primary goal of statutory construction is to carry out legislative intent." *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 807, 16 P.3d 583 (2001). We derive the legislative intent primarily from the statute's language. *City of Bellevue v. E. Bellevue Cmty. Council*, 138 Wn.2d 937, 944, 983 P.2d 602 (1999). In doing so, we read the statute as a whole. *Miller v. City of Tacoma*, 138 Wn.2d 318, 338, 979 P.2d 429 (1999) (Madsen, J., concurring/dissenting). And we place the language in the context of the overall legislative scheme. *Subcontractors & Suppliers Collection Servs. v. McConnachie*, 106 Wn. App. 738, 741, 24 P.3d 1112 (2001).

 The plain language of the private communications statute states that tape recordings of inmate conversations shall be divulged "in response to a court order . . . ." RCW 9.73.095(3)(b). Thus, the court had the authority to order the production of the tapes. This court must address

whether the trial court abused its discretion by not ordering that the tape be produced. We hold that it did not.

██ ██ Admissibility of evidence is within the broad discretion of the trial court and will not be reversed on appeal absent a showing of manifest abuse of discretion. *Sintra, Inc. v. City of Seattle*, 131 Wn.2d 640, 662-63, 935 P.2d 555 (1997). Discretion is abused if it is based on untenable grounds or for untenable reasons. *In re Marriage of Ricketts*, 111 Wn. App. 168, 171, 43 P.3d 1258, 1259 (2002). This court may sustain a trial court on any correct ground, even though that ground was not considered by the trial court. *Nast v. Michels*, 107 Wn.2d 300, 308, 730 P.2d 54 (1986).

██ Hazen argues that the tape recording would have been admissible under ER 804(b)(3) as a statement against penal interest. Out of court (hearsay) statements are normally inadmissible because they violate the confrontation clause of the United States Constitution. U.S. CONST. amend. VI. ER 804(b)(3) allows a hearsay statement to be admitted into evidence if it was, at the time it was made, "so far contrary to the declarant's pecuniary or proprietary interest . . . that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." ER 804(b)(3). But it is unclear to what extent the statement was adverse to Gardley's interests. Moreover, Hazen did not offer the tape in evidence against its declarant, or a co-conspirator (Calliham's son). He sought to have the statement admitted against a third party, Calliham, in an unrelated civil matter. As such the tape is rank hearsay and inadmissible. *See State v. Whelchel*, 115 Wn.2d 708, 721-22, 801 P.2d 948 (1990) (self-serving statements not admissible under ER 804(b)(3)).[2]

---

[2] Additionally, it does not appear that these statements satisfy any ER 803 hearsay exceptions because they fail to meet the threshold for admissibility, namely an indicia of reliability. *See State v. Sosa*, 59 Wn. App. 678, 684, 800 P.2d 839 (1990) (hearsay evidence admissible if it falls within firmly rooted hearsay exceptions or has "particularized guaranties of trustworthiness") (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)). Here, Hazen

Thus, because we hold that under the circumstances of this case the statement would not have been admissible against Calliham, a third party in an unrelated civil action, we affirm the trial court on other grounds. Because the evidence sought was inadmissible, we do not address Hazen's constitutional arguments.

RECUSAL ISSUE

 Judges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned. MODEL CODE OF JUDICIAL CONDUCT Canon 3(D)(1) (1999). The party moving for recusal must demonstrate prejudice on the judge's part. *In re Marriage of Farr*, 87 Wn. App. 177, 188, 940 P.2d 679 (1997). Recusal is within the sound discretion of the trial court. *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 840, 14 P.3d 877 (2000).

During a pretrial hearing, the judge stated that he did not have certain of the papers submitted. Apparently they had been clipped to some other papers and the judge did not realize he had both sets. Hazen moved for the judge to recuse himself, alleging that the court's mistaken belief that it was missing some papers showed that the judge did not read everything provided and demonstrated that the judge was prejudiced against him. The judge declined to recuse himself. Hazen now argues to this court that the judge abused his discretion by not recusing himself.

Having reviewed the record before us, we find no error. By all accounts, this trial had a number of high tension moments. At the time in question, the trial judge ruled incorrectly on the admissibility of a tape recording of a

acknowledges that the inmate knew that the phone calls were taped because "an announcement to that effect is made by the telephone operator at the start of every prisoner initiated call." Br. of Appellant at 33-34. Moreover, the Department of Corrections argued that inmates routinely use these tape-recorded conversations to create evidence, which is why the Department did not want the tape recording released. With uncertain reliability, a motive to fabricate and no spontaneity, these out-of-court statements offered to show the truth of the matter asserted in a conversation with Hazen's counsel were inadmissible. Hazen attempted to have Gardley transported from the prison to testify, but he exercised his Fifth Amendment privilege to avoid self-incrimination. Hazen presented no admissible evidence of Calliham's involvement in the Gardley drug buy.

conversation (between Calliham and Hazen) without reviewing the papers in question, which were mistakenly clipped to something else. Later that day the trial court reconsidered its ruling and allowed the controversial tape recording[3] to be heard by the guardian ad litem and the parenting evaluator. Still later, Calliham agreed to allow the tape to be entered into evidence and Hazen experienced no prejudice. This record provides no basis requiring recusal.[4]

CHILD SUPPORT

██ One of the purposes of a paternity proceeding is to establish the legal obligation of support. *State v. Pearson*, 13 Wn. App. 870, 873, 538 P.2d 567 (1975). A judgment and order for child support shall contain other provisions "directed to the appropriate parties to the proceeding, concerning . . . the furnishing of bond or other security for the payment of the judgment . . . ." RCW 26.26.130(3). The trial judge addressing the question of bond, should consider the property and personal ties of the father to the area

---

[3] Hazen had surreptitiously tape-recorded the conversation while he was in Colorado. Because Calliham was in Washington at the time, the trial court initially believed that the tape recording was illegal and inadmissible. Chapter 9.73 RCW. *But see Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 186, 829 P.2d 1061 (1992) (courts determine the validity of telephone interception by examining the law of the jurisdiction where interception occurred).

[4] Although Hazen argues the judge's comment disregarding a Supreme Court case demonstrates to a reasonable person an inference of nonimpartiality, the record contains other instances of Hazen's trial attorney exasperating the judge or attempting to change judges mid-stream. After six months of motions, and four days before trial began, one such exchange went as follows:

THE COURT: This is the schedule. It is 11 days of trial, two weeks and one day of trial time, in-court time. That's all that I have until later in the summer or early in the fall.

[Hazen's attorney]: Your Honor, the court's schedule puts us in the dilemma that the best interests of the child may not be served by having Your Honor stay on the case. . . . Because of your very limited availability and the prospects of a six-month continuance, I would ask that the case be reassigned to another judge.

THE COURT: I am not going to do that. . . . I've now allowed you more than twice the amount of court time as this matter was originally set for last November.

Report of Proceedings (Feb. 25, 2000) at 8-9. We see no reason for recusal.

where the child resides and the father's attitude and responsibility toward the child based on his past actions. *Pearson*, 13 Wn. App. at 873.

Here, the trial court ordered Hazen to "either procure life insurance [for the benefit of the child] to guarantee the continuing payment of the support of the Baby or acceptable trust or estate planning provisions which would guarantee the payment of the support for the Baby beyond the death of the Father." Clerk's Papers at 1340. Hazen argues that under *In re Marriage of Briscoe*, 134 Wn.2d 344, 949 P.2d 1388 (1998), the court erred by not accepting credits for anticipated social security payments in satisfaction of this obligation. Again, we disagree.

RCW 26.18.190(2) states,

> When the social security administration pays social security disability dependency benefits, retirement benefits, or survivors insurance benefits on behalf of or on account of the child or children of a disabled person, a retired person, or a deceased person, the amount of benefits paid for the child or children shall be treated for all purposes as if the . . . person paid the benefits toward the satisfaction of that person's child support obligation for that period for which benefits are paid.

RCW 26.18.190(2) is unambiguous: payments paid directly to the children satisfy, at least partially, the parent's support obligation. *Briscoe*, 134 Wn.2d at 348. The goal of statutory construction is to carry out legislative intent and if a statute is plain and unambiguous, its meaning must be primarily derived from the language itself. *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 806-07, 16 P.3d 583 (2001).

We hold that the words of RCW 26.18.190(2), "When the social security administration pays," refer to current payments actually being made. Here there are no current social security payments. The statute does not apply and *Pearson*, not *Briscoe*, controls. Thus, we hold that the trial court properly exercised its discretion and ordered a bond or security to guarantee payment of Hazen's future child support obligations.

ATTORNEY FEES

Hazen argues that the court erred when it ordered him to pay Calliham $12,750 as an appellate attorney fee retainer ("suit money"). As she did below, Calliham relies on RCW 26.12.190(1) and RAP 7.2(d) to support her claim that the trial court had the discretion to award her "suit money."

█ RCW 26.12.190(1) provides:

The family court shall have jurisdiction and full power in all pending cases to make, alter, modify, and enforce all temporary and permanent orders regarding the following: Parenting plans, child support, custody of children, visitation, possession of property, maintenance, contempt, custodial interference, and orders for attorneys' fees, suit money or costs as may appear just and equitable.

Likewise RAP 7.2(d) gives the trial court discretion to award "suit money":

The trial court has authority to award attorney fees and litigation expenses for an appeal in a marriage dissolution, a legal separation, a declaration of invalidity proceeding, or an action to modify a decree in any of these proceedings, and in any other action in which applicable law gives the trial court authority to do so. To obtain review of a trial court decision on attorney fees and litigation expenses in the same review proceeding as that challenging the judgment, a party must file an amended notice of appeal or an amended notice for discretionary review in the trial court.

Because this is not a marriage dissolution, a legal separation, or a declaration of invalidity proceeding, neither RCW 26.12.190(1) nor RAP 7.2(d) gives the trial court authority to award "suit money." At first, this may appear an anomalous distinction. We note, however, that in a marriage dissolution, a legal separation or a declaration of invalidity proceeding, the assets of the parties (separate and community) are before the court for distribution. RCW 26.09.080. Moreover, the assets of a married couple are presumptively community property. *In re Marriage of Zahm*, 138 Wn.2d 213, 223, 978 P.2d 498 (1999).

Here, there never has been any community property. Hazen has no financial relationship with Calliham, only

with J.H. Thus, we hold that, where the parties were never married, neither RCW 26.12.190(1) nor RAP 7.2(d) give the trial court authority to order "suit money."

██ Calliham also claims that RCW 26.26.140, the Uniform Parentage Act, gives the trial court authority to require one party to advance the other appellate attorney fees. But that statute does not address "suit money" or suggest payment of appellate fees.

> The court may order reasonable fees of experts and the child's guardian ad litem, and other costs of the action, including blood or genetic test costs, to be paid by the parties in proportions and at times determined by the court. The court may order that all or a portion of a party's reasonable attorney's fees be paid by another party, except that an award of attorney's fees assessed against the state or any of its agencies or representatives shall be under RCW 4.84.185.

RCW 26.26.140.

██ In the absence of a specific statutory provision requiring that a request for attorney fees is to be directed to the trial court, only the appeals court has authority to award attorney fees on appeal. RAP 18.1. Generally only the appellate court can determine who is the prevailing party entitled to payment of fees. *See also Hedlund v. Vitale*, 110 Wn. App. 183, 190-91, 39 P.3d 358 (2002) (on remand, trial court lacks authority to award attorney fees for an appeal where none were requested of the appellate court).

Calliham and Hazen each request attorney fees under RAP 18.1. We hold that Calliham, as the prevailing party and having complied with the provisions of that rule, is entitled to receive attorney fees she expended defending the trial court's residential placement and support decisions.

Hazen and Calliham fully presented their respective claims for custody of J.H. The trial court did not abuse its discretion in making the parental placement decision and its orders to ensure continuation of J.H.'s support are affirmed. But because the trial court lacked authority to

award "suit money" we vacate that portion of the order requiring Hazen to advance Calliham $12,750 to defend the appeal. We hold, however, that Calliham is entitled to payment of attorney fees she expended defending the trial court's residential placement and support decisions in an amount to be determined by the commissioner of this court, crediting the amounts, if any, Hazen has already paid.

Affirmed in part and reversed in part.

SEINFELD and HOUGHTON, JJ., concur.

After modification, further reconsideration denied August 23, 2002.

Review denied at 148 Wn.2d 1024 (2003).